IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WIMBERLY ALLISON TONG & GOO, INC., | HON. JEROME B. SIMANDLE |
| Plaintiff, | Civil Action No. 05-2550 |
| v. | |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA and GULF UNDERWRITERS INSURANCE GROUP, | **OPINION** |
| Defendants. | |

APPEARANCES:

Carl A. Salisbury, Esq.
KILLIAN & SALISBURY, PC
77 Brant Avenue
PO Box 917
Clark, NJ 07066
    Attorney for Plaintiff Wimberly, Allison, Tong, & Goo, Inc.

George R. Hardin, Esq.
HARDIN, KUNDLA, MCKEON, POLETTO & POLIFRONI, PC
673 Morris Avenue
PO Box 730
Springfield, NJ 07081-0730
    Attorney for Defendants Travelers Property Casualty Company
    of America and Gulf Underwriters Insurance Group

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

    This Court addresses the parties' cross-motions for summary

judgment.  This lawsuit was filed by Wimberly, Allison, Tong &

Goo ("WATG"), an architecture firm specializing in large-scale

commercial construction projects, against two insurance companies

from which WATG purchased general and excess liability insurance.

WATG's insurance agreements with both Defendant insurance providers, Travelers Property Casualty Company of America ("Travelers") and Gulf Underwriters Insurance Group ("Gulf"), excluded from coverage injuries arising out of WATG's provision of "professional services."  In 2003, a parking garage at the Tropicana Casino and Resort (the "Tropicana") in Atlantic City, New Jersey, that WATG had designed collapsed, killing and injuring many workers and precipitating the filing of numerous lawsuits against multiple parties, including WATG.  Travelers and Gulf refused to defend WATG against these suits, citing the professional services exclusion in their respective contracts.

The Court must determine whether the professional services exclusion in the general commercial liability policy and excess policy excludes coverage for the claims WATG faced in the construction collapse lawsuits.  On May 13, 2005, WATG filed suit against Travelers and Gulf, alleging that the insurers' refusal to defend WATG was inconsistent with the parties' contracts and New Jersey law.  The parties have filed cross-motions for summary judgment [Docket Items 30 and 32].  For the reasons discussed below, the Court will grant Defendants' motion for summary judgment and deny Plaintiff's cross-motion for summary judgment.

## II.  BACKGROUND

### A.  Facts

#### 1.  The Tropicana Garage Collapse and Resultant Lawsuits

On November 10, 2000, WATG entered into an agreement (the "Tropicana contract") with Adamar of New Jersey ("Adamar"), which owns and operates the Tropicana, to expand and renovate the casino.  (Pl.'s Statement of Undisputed Material Facts ("SUMF") ¶ 1.)  Adamar subsequently assigned its contractual agreement with WATG to Keating Building Corporation ("Keating"), the general contractor for the Tropicana construction project.  (Povelones Dec. Ex. E.)  Under the Tropicana contract, WATG agreed to provide professional services related to the renovation and expansion of the Tropicana, including architecture, structural and mechanical engineering, and construction administration.  (Id.)  WATG subsequently entered into various subcontracting agreements, including an agreement with DeSimone Consulting Engineers, P.L.L.C. ("DeSimone"), which WATG retained to provide structural engineering services, (Povelones Dec. Ex. F), and SOSH Architects ("SOSH"), a local architecture practice that WATG hired to serve as local architect and to provide various architectural services.  (Povelones Dec. Ex. G.)

On October 30, 2003, six levels of a parking garage being constructed as part of the Tropicana renovation project collapsed, killing four people and injuring many others.  (Pl.'s

SUMF ¶ 2; Defs.' SUMF ¶ 14.)  Numerous lawsuits ensued in which a wide range of parties, including WATG, were named as defendants.

The majority of these lawsuits were consolidated in the Superior Court of New Jersey, Atlantic County, with a general Master Complaint that was to be employed by all individual plaintiffs.  (Povelones Dec. Ex. S.)  The claims against WATG in the consolidated actions were contained in Count X of the Master Complaint.  (Id. at Count X, ¶¶ 1-9.)  Count X alleged that WATG "deviated from the standard of care that should have been utilized as professionals in the fields of architecture relative to the design and supervision of the construction of [the] Garage," (id. at ¶ 5), that these deviations from the standard of care was the cause of the plaintiffs' injuries, (id. at ¶ 6), failed to conform to OSHA standards, (id. at ¶ 8), and was "otherwise careless and negligent" in its role as architect. (Id. at ¶ 9.)  As Plaintiff notes, the Civil Case Information Statements included with the individual short form complaints in these consolidated actions did not mark the box that would have indicated that the actions were professional malpractice claims. (Pl.'s Opp'n Br. Ex. A.)

In addition to the consolidated actions, two non-consolidated cases relating to the garage collapse were filed in which WATG was named as a defendant.  In the first, Govathlay Givens, a cement finisher who was working in the garage at the

time of the collapse, sued WATG, in conjunction with numerous
defendants, in order to recover for the injuries he suffered as a
result of the collapse.  (Povalones Dec. Ex. U.)  Givens'
complaint alleged that WATG was responsible for, <u>inter alia</u>,
design, quality control, and construction supervision of the
parking garage, and claimed that WATG failed "to perform as a
reasonable architect would under the same or similar
circumstances."  (<u>Id.</u> at Count II ¶ 3.)  Givens alleged that
WATG's failure to adhere to the standards of professional care
was negligent, reckless, and willful.  (<u>Id.</u>)

     The second non-consolidated action was filed by a business
called Another Time, Inc. ("Another Time"), which was located
near the site of the garage collapse.  (Povalones Dec. Ex. X.)
Another Time sued a large number of parties, including WATG.
(<u>Id.</u>)  Its complaint, asserted against all defendants
collectively, contained allegations of negligence (Count I),
private nuisance (Count II), and public nuisance (Count III).
(<u>Id.</u>)

     Finally, Aztar Corporation ("Aztar"), Adamar's parent
company, Keating, and Fabi Construction, Inc. ("Fabi"), the
construction subcontractor, filed third-party claims against
WATG, seeking contribution and indemnification.  (Povalones Dec.
Exs. Y, Z and AA.)  These claims alleged that WATG "deviated from
the standard of care of professionals in the field of

architecture in, among other things, the supervision of design
and architectural administration of construction at the Tropicana
Construction Project," and that these "deviations from the
standard of care for professional architects and for professional
architecture firms were a cause" of the injuries asserted by the
plaintiffs.  (Povalones Dec. Ex. Z ¶¶ 36-37.)

      2.   <u>WATG's Insurance Agreements</u>

At the time of the garage collapse, WATG was covered by
three insurance plans that are relevant to the instant lawsuit:
(1) a commercial general liability policy with Travelers, (2) a
commercial excess liability policy with Gulf, and (3) a
professional liability policy with Continental Casualty Company
("CCA").  The relevant provisions of these insurance agreements
are described below.

Travelers issued WATG a commercial general liability policy
for the period of April 1, 2003 to April 1, 2004.  (Salisbury
Aff. Ex. A.)  The policy provided coverage for "damages because
of 'bodily injury' or 'property damage'" caused by an
"occurrence" that took place within the coverage territory during
the policy period.[1]  (<u>Id.</u>)  The policy provided up to $1,000,000

---

    [1]  The policy agreement contains definitions of all relevant
terms, including "bodily injury," "property damage," and
"occurrence."  The parties do not appear to dispute that the
parking garage collapse was an occurrence that resulted in bodily
injury and property damage, as those terms are defined in the
Travelers plan.

in coverage for any single occurrence, and up to $5,000,000 in
total liability.  (Id.)  The policy further provided that
Travelers would pay WATG's legal fees and expenses associated
with claims that fell within the plan's coverage.  (Id.)

Significantly, for purposes of this lawsuit, the Travelers
plan excluded from coverage injuries resulting from WATG's
provision of "professional services."  (Id.)  Specifically, the
plan provided:

> This insurance does not apply to "bodily injury,"
> "property damage," "personal injury" or "advertising
> injury" arising out of the rendering of or failure to
> render any professional services by you or any engineer,
> architect or surveyor who is either employed by you or
> performing work on your behalf in such capacity.
>
> Professional services include:
>
> 1.  The preparing, approving, or failing to prepare or
> approve maps, shop drawings, opinions, reports, surveys,
> field orders, change orders, or drawings and
> specifications; and
>
> 2. Supervisory, inspection, architectural or engineering
> activities.

(Id.)

Gulf issued WATG a commercial excess liability policy for
the period of April 1, 2003 to April 1, 2004.  (Salisbury Aff.
Ex. B.)  Under the policy, Gulf agreed to insure and defend WATG
against claims that were not payable by its primary policy or
other existing insurance policy as a result of either the
exhaustion or non-coverage of the underlying insurance plans.
(Id.)  The policy provided up to $10,000,000 in coverage for any

single occurrence, and up to $10,000,000 in total liability.

(Id.)  Like the Travelers policy, the Gulf plan contained a

provision excluding from coverage injuries resulting from the

provision of "professional services":

> This insurance does not apply to "bodily injury,"
> "property damage," "personal injury," or "advertising
> injury" arising out of:
>
> 1.  the rendering of; or
> 2.  failure to render;
>
> any professional services by or for you.

(Id.)

In addition to the insurance policies it obtained from

Defendants, WATG had professional liability insurance policies

that it purchased from CCA, which are not at issue in this case.[2]

(Povalones Dec. Exs. C, D.)

> 3.  Defendants' Responses to the Garage Collapse
>     Claims

The parties do not appear to dispute that Plaintiff timely

gave notice to Defendants about the underlying lawsuits and

requested that the insurers defend Plaintiff, and that Defendants

---

[2]  WATG's policies with CCA covered the period between
November 15, 2002 and November 15, 2003.  (Id.)  WATG's primary
professional liability policy provided coverage of up to
$1,000,000 per claim (and in total liability), with a $250,000
per claim deductible.  (Povalones Dec. Ex. C.)  In addition, WATG
obtained from CCA an excess professional liability policy that
covered up to $2,000,000 per claim, with $5,000,000 in aggregate
liability, for claims in excess of the $1,000,000 primary
professional liability policy.  (Povalones Dec. Ex. D.)

denied coverage.  Specifically, Plaintiff first notified
Travelers of the Givens lawsuit, which, in a letter dated May 12,
2004, Travelers determined was outside the scope of its coverage,
citing the professional liability exclusion contained in its
policy.  (Salisbury Aff. Ex. C.)  By letters dated July 20, 2004,
October 4, 2004, December 10, 2004, March 10, 2005, and May 2,
2005, Plaintiff informed Travelers about the additional lawsuits
that had been filed against it.  (Salisbury Aff. Exs. F-J.)
Travelers responded to these letters by reiterating the position
it had taken in its May 12, 2004 letter – namely, that these
claims, like Givens', arose out of the professional services
Plaintiff had rendered, thereby bringing them within the
professional services exclusion to Travelers' policy.  (Salisbury
Aff. Ex. L.)

        Similarly, WATG notified Gulf of the lawsuits that had been
filed against it and requested that Gulf defend it against these
claims.  Like Travelers, Gulf responded to Plaintiff's request by
invoking the professional services exclusion in its policy, and
reserved its right to deny coverage to Plaintiff.  (Salisbury
Aff. Ex. P.)

        Prior to seeking coverage from either Defendant following
the garage collapse, Plaintiff communicated with CCA regarding
that insurer's defense of Plaintiff against the claims arising
out of the garage collapse.  (Holecek Dep. 170.)  On March 2,

2004, CCA informed Plaintiff that it would defend and indemnify Plaintiff, but that its policy would not cover claims for punitive damages or contractual indemnification.  (Povalones Dec. Ex. Q.)  The lawsuits against Plaintiff subsequently settled, with WATG ultimately paying $500,000 without admitting liability. According to WATG, it incurred $2,323,000 in defense costs and legal fees that were never reimbursed by any of its insurance carriers.

**B.   Procedural History**

Plaintiff filed this lawsuit against Defendants on May 13, 2005.  Plaintiff's Complaint seeks a declaratory judgment against Travelers (Count I) and Gulf (Count II) that both Defendants were required under the terms of their respective policies to defend Plaintiff; alleges that Travelers (Count III) and Gulf (Count IV) breached their contractual agreements with Plaintiff; and alleges that Travelers (Count V) and Gulf (Count VI) breached their covenant of good faith and fair dealing with Plaintiff.  On January 29, 2008, after two years of discovery, both parties filed cross-motions for summary judgment.  The Court convened a hearing on June 2, 2008, at which Plaintiff and Defendant presented oral argument, and reserved decision.

## III. DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).

The summary judgment standard does not change when, as here, the parties have filed cross-motions for summary judgment. See Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is
> entitled to summary judgment, and the making of such
> inherently contradictory claims does not constitute an
> agreement that if one is rejected the other is
> necessarily justified or that the losing party waives

11

judicial consideration and determination whether genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 145-46 (3d Cir. 1998)).

**B.   Analysis**

For the reasons set forth below, the Court finds that Defendants had no duty to defend Plaintiff against the claims arising out of the Tropicana garage collapse, because those claims all alleged injuries arising out of Plaintiff's provision of professional services, which were not covered by either the Travelers or Gulf policies.  Accordingly, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross-motion for summary judgment, for the reasons now explained.

1.   Breach of Contract and Declaratory Judgment Claims

Under New Jersey law, "[t]he interpretation of an insurance contract on undisputed facts is a question for the court to decide as a matter of law and can be the basis for summary

12

judgment."[3]  American Cas. Co. of Reading, Pennsylvania v.
Continisio, 819 F. Supp. 385, 396 (D.N.J. 1993) (citation
omitted).  New Jersey courts, in determining whether a claim
against an insured creates a duty of the insurer to defend, base
their determinations upon a comparison of the allegations
contained in the underlying complaint with the language of the
insurance policy.  Voorhees v. Preferred Mut. Ins. Co., 128 N.J.
165, 173 (1992); see also Voorhees v. Preferred Mut. Ins. Co.,
246 N.J. Super. 564, 569 (App. Div. 1991), aff'd id. ("If the
pleadings state facts bringing the injury within the coverage of
the policy, the insurer must defend regardless of the insured's
ultimate liability to the complainant.").  If the factual
allegations in the underlying complaint fall within the scope of
the policy's coverage, then "the duty to defend arises,
irrespective of the claim's actual merit."  Voorhees, 128 N.J. at
173.  That is, an insurer is not relieved of its duty to defend
simply because the underlying allegations against the insured are
"groundless, false or fraudulent."  Danek v. Hommer, 28 N.J.
Super. 68, 77 (App. Div. 1953) ("Liability of the insured to the
plaintiff is not the criterion; it is the allegation in the
complaint of a cause of action which, if sustained, will impose a
liability covered by the policy.").

---

[3]  The parties are in agreement that New Jersey law governs
the Court's interpretation of the insurance policies at issue in
this dispute.

It is well-settled under New Jersey law that if the allegations in the underlying complaint are ambiguous, such that the claims might or might not fall within the scope of coverage, such ambiguities are resolved in favor of coverage.  See Doto v. Russo, 140 N.J. 544, 556 (1995); see also Voorhees, 128 N.J. at 173; L.C.S., Inc. v. Lexington Ins. Co., 371 N.J. Super. 482, 490 (App. Div. 2004).  This is "because insurance policies are adhesion contracts, [and so] courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." Voorhees, 128 N.J. at 175.  Moreover, when multiple claims are asserted against an insured, some of which are covered by the insurance policy and some of which are not, "the duty to defend will continue until every covered claim is eliminated."[4]  Id. at 174.  While an insurer may endeavor to preserve its rights in such situations by entering the litigation under a reservation of rights and by filing a separate declaratory judgment action, L.C.S., 371 N.J. Super. at 493, it

_____

[4]  As the New Jersey Supreme Court has explained,

To hold otherwise would be to place upon the insured the burden of demonstrating in advance of the underlying litigation which of the competing theories of recovery against it was applicable for purposes of insurance, thereby frustrating one of the basic purposes of such a clause in the insurance contract – protection of the insured from the expenses of litigation.

Voorhees, 128 N.J. at 174 (quoting Solo Cup Co. v. Federal Ins. Co., 619 F.2d 1178, 1185 (7th Cir. 1980)).

may not refuse to defend its insured where the underlying claims at least arguably fall within the ambit of the policy's coverage.

Notwithstanding the significance of the above-described jurisprudence for protecting the rights of an insured by resolving ambiguities in the scope of coverage in its favor, "the words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability." Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J. 530, 537 (1990). Put more directly, the Court cannot "write for the insured a better policy of insurance than the one purchased." Id. (citation omitted).

This is also true of insurance policy exclusions such as the ones at issue in this case. While such exclusions are to be "construed narrowly," the New Jersey Supreme Court has made clear that "exclusions are presumptively valid and will be given effect if specific, plain, clear, prominent, and not contrary to public policy." Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 95 (1997) (internal quotations and citation omitted). As Defendants have argued, New Jersey courts, like the Court of Appeals for the Third Circuit, have given effect to professional services exclusions in general liability policies. See, e.g., Search EDP, Inc. v. American Home Assur. Co., 267 N.J. Super 537, 541-42

(App. Div. 1993), <u>cert.</u> <u>denied</u>, 135 N.J. 466 (1994); <u>Harad v.</u> <u>Aetna Cas. and Sur. Co.</u>, 839 F.2d 979, 985 (3d Cir. 1988).

According to Plaintiff, "the complaints in the underlying actions contain allegations that create the possibility of coverage" under Defendants' policies, which, Plaintiff claims, required Defendants to defend Plaintiff until it was unambiguously clear that the professional services exception was applicable to all asserted claims.  (Pl.'s Br. 13.)  Rather than addressing whether each complaint contained allegations that arguably fell outside of the policies' professional services exceptions, Plaintiff appears to treat the Givens, Another Time, and Master Complaint claims against it collectively, asserting, rather misleadingly,[5] that the Givens complaint and all "subsequent complaints contained counts for negligence, private nuisance, and public nuisance."  (<u>Id.</u> at 14.)  These claims, Plaintiff argues, were not so obviously related to Plaintiff's provision of professional services that the insurers could permissibly invoke the professional services exception at the outset, since under New Jersey law, doubts about whether a claim

---

[5]  The Givens complaint did not assert nuisance claims against Plaintiff, but instead alleged that WATG failed "to perform as a reasonable architect would under the same or similar circumstances."  (Povalones Dec. Ex. U at Count II ¶ 3.) Likewise, the Master Complaint in the consolidated cases did not assert any nuisance claims against Plaintiff.  (Povolones Dec. Ex. S. at Count X, ¶¶ 1-9.)  The only nuisance claims that could be construed as having been asserted against Plaintiff were those contained in the Another Time complaint.  (Povalones Dec. Ex. X.)

falls within an insurance plan's coverage are resolved in favor of the insured.  See, e.g., Danek, 28 N.J. Super. at 77.

In arguing that the claims asserted in the underlying actions did not unambiguously fall within Defendants' professional services exceptions, Plaintiff places particular emphasis on the fact that the plaintiffs in those actions did not indicate on the Civil Case Information Statements submitted in conjunction with their complaints that the actions contained professional malpractice claims.  (Pl.'s Opp'n Br. Ex. A.) Because the plaintiffs in those actions did not themselves characterize their claims against WATG as being professional malpractice actions in their Case Information Statements, WATG argues, Defendants could not have concluded at the outset that the claims fell within the professional services exceptions of their respective policies.

According to Defendants, the factual bases underlying the various claims that were asserted against Plaintiff all indicate that the claims arose out of Plaintiff's provision of professional services: (1) the Master Complaint alleged that WATG "deviated from the standard of care that should have been utilized as professionals in the fields of architecture," (Povelones Dec. Ex. S at Count X, ¶ 5); (2) Givens' complaint alleged that WATG failed "to perform as a reasonable architect would under the same or similar circumstances," (Povalones Dec.

17

Ex. U at Count II ¶ 3); (3) Another Time's complaint attacked
WATG's negligent design and supervision, (Povalones Dec. Ex. X at
¶ 5); and (4) the third-party claims against WATG likewise
focused on its deviation from professional standards of care.
(Povalones Dec. Ex. Z ¶¶ 36-37.)  As Defendants note, "WATG
conspicuously fails to point to any specific allegation in the
Underlying Actions in support of its conclusory assertion" that
the claims in those actions were not based upon WATG's provision
of professional services.  (Defs.' Reply Br. 6.)  According to
Defendants, Plaintiff's failure to identify any specific factual
allegations in the underlying actions that even arguably fall
outside of the policies' professional services exceptions makes
Plaintiff's reliance upon cases like L.C.S., in which some claims
were conceivably covered and some were not, misplaced.  See
Conduit and Foundation Corp. v. Hartford Cas. Ins. Co., 329 N.J.
Super. 91, 105 (App. Div. 2000).

        The Court finds that all claims filed against Plaintiff in
the wake of the Tropicana garage collapse fell within the
professional services exceptions of both the Travelers and Gulf
policies, making the insurers' denial of coverage consistent with
the terms of the parties' contracts and New Jersey law.  Because,
as was noted, supra, the duty to defend arises when "the
pleadings state facts bringing the injury within the coverage of
the policy," Voorhees, 246 N.J. Super. at 569, the starting point

                                    18

for the Court's analysis is a comparison of the language of the
two policies with the factual allegations contained in the
underlying complaints.

The professional services exceptions to both policies
provided that "[t]his insurance does not apply to 'bodily
injury,' 'property damage,' 'personal injury' or 'advertising
injury' arising out of the rendering of or failure to render any
professional services" by WATG.  (Salisbury Aff. Exs. A and B.)
While the Gulf policy does not define "professional services,"
the Travelers policy states that such services include "[t]he
preparing, approving, or failing to prepare or approve maps, shop
drawings, opinions, reports, surveys, field orders, change
orders, or drawings and specifications; and . . . [s]upervisory,
inspection, architectural or engineering activities."  (Salisbury
Aff. Ex. A.)

The inclusion of supervisory and inspection-related
activities within the definition of "professional services" is
consistent with New Jersey law, which recognizes that when a
professional party, such as an architectural or engineering
practice, supervises the implementation of its work, such
supervision is performed in its professional capacity.[6]  See

_____

    [6]  The Court of Appeals, in interpreting the reference to
"professional services" in an insurance policy, has noted that

       [a] 'professional' act or service is one arising out of
    a vocation, calling, occupation, or employment involving

Borough of Berlin v. Remington & Vernick Engineers, 337 N.J.
Super. 590, 599 (App. Div. 2001).  This is because the
"supervision" of architectural and engineering work requires "the
specialized knowledge and mental skill of a professional,"
Atlantic Mut. Ins. Co. v. Continental Nat. Am. Ins. Co., 123 N.J.
Super. 241, 247 (Law Div. 1973), in that "'professional services'
embrace those activities that distinguish a particular occupation
from other occupations – as evidenced by the need for specialized
learning or training – and from the ordinary activities of life
and business."  Hampton Medical Group, P.A. v. Princeton Ins. Co.
366 N.J. Super. 165, 178 (App. Div. 2004) (citation omitted).  As
the New Jersey Supreme Court has explained, in determining
whether the professional services clause of an insurance policy
is applicable, the Court must ask "whether a substantial nexus
exists between the context in which the acts complained of

---

     specialized knowledge, labor, or skill, and the labor or
     skill involved is predominantly mental or intellectual,
     rather than physical or manual.

Harad, 839 F.2d at 984 (citation omitted); see also Hampton
Medical Group, 366 N.J. Super. at 178 (same).

20

occurred and the professional services [performed]."[7]  <u>Chunmuang</u>,
151 N.J. at 97.

Comparing the language of the insurance policies'
professional services exceptions with the allegations contained
in the complaints filed against WATG, it is clear that Defendants
did not breach the terms of their agreements with WATG in denying
coverage, because the claimed injuries all "ar[ose] out of the
rendering of or failure to render . . . professional services" by
WATG.  (Salisbury Aff. Exs. A and B.)  The first complaint filed
against WATG in connection with the garage collapse was that of
Govathlay Givens.  (Povalones Dec. Ex. U.)  Givens alleged that
WATG "breached its duty of care to . . . [Givens] by failing to
perform as a reasonable architect would under the same or similar
circumstances."  (<u>Id.</u> at Count II ¶ 3.)  Givens' complaint also
specifies which of WATG's professional activities were the
subject of Givens' allegations, noting that WATG's

_____

[7]  It is true that the quoted language appeared in a
discussion of whether a particular activity was <u>included</u> in a
professional services liability policy, whereas the question
before the Court is whether claims are <u>excluded</u> by a professional
services exception.  As was noted, <u>supra</u>, under New Jersey law,
ambiguous questions over insurance policies are resolved in favor
of coverage, making the context of the Court's discussion in
<u>Chunmuang</u> distinct from that in the case presently under
consideration.  <u>See</u> <u>Doto</u>, 140 N.J. at 556.  However, because the
New Jersey Supreme Court has also instructed that "a court should
not engage in a strained construction to support the imposition
of liability," <u>Longobardi</u>, 121 N.J. at 537, that Court's
interpretation of the term "professional services" is useful in
assessing the parties' "reasonable expectations" regarding the
scope of coverage.  <u>Voorhees</u>, 128 N.J. at 175.

"responsibilities included . . . design, specification, inspection, supervision, and quality control of work being performed by the general contractor and all employed subcontractors on the parking garage project." (Id.)  Givens' claims are unambiguously directed at WATG's allegedly substandard provision of professional services, see Hampton Medical Group, 366 N.J. Super. at 178, and there simply are no allegations in the complaint that even arguably fall outside of the insurance policies' professional services exceptions.

    The same is true of the other complaints filed against WATG following the garage collapse.  In the complaint filed by Another Time, for example, while the plaintiff asserted claims of negligence, private nuisance, and public nuisance, all of these claims incorporate the "Underlying Facts" that formed the basis of the plaintiff's complaint.  See Voorhees, 246 N.J. Super. at 569 (the duty to defend arises when "the pleadings state facts bringing the injury within the coverage of the policy") (emphasis added).  These facts, like those alleged by Givens, obviously target only the activities WATG performed in its capacity as an architect, such as the "[v]iolation of construction codes," "[f]ailing to use proper materials in constructing the garage," and "[f]ailing to design proper blue prints for construction of the garage." (Povalones Dec. Ex. X.)  These activities are not "the ordinary activities of . . . [operating a] business,"

22

<u>Hampton Medical Group</u>, 366 N.J. Super. at 178, which would fall outside the scope of the policies' professional services exceptions, but are instead the very professional services that are exempted from coverage under the Travelers and Gulf policies. <u>See</u> <u>id.</u> (distinguishing professional services from ordinary business activities, such as billing clients).  The same is true of the Master Complaint[8] in the consolidated actions, and the third-party claims filed against WATG, each of which alleged that WATG's work on the Tropicana parking garage deviated from its professional standard of care.  (Povelones Dec. Ex. S at Count X, ¶ 5; Ex. Y at ¶ 27; Ex. Z at ¶ 37; Ex. AA at ¶ 34.)

Critically, despite its reliance upon the principle that ambiguities in claims against an insured are resolved in favor of insurance coverage, Plaintiff has not identified any factual allegations in an underlying complaint that could reasonably be considered to be ambiguous as to whether or not the alleged

---

[8]  It is true that the Master Complaint also alleges that WATG was "otherwise careless and negligent."  (Povelones Dec. Ex. S at Count X, ¶ 9.)  In light of the fact that all of the facts alleged in the Master Complaint frame WATG's liability in terms of its provision of architectural services, the Court agrees with Defendants that the Master Complaint obviously charges WATG with being otherwise careless in its provision of <u>professional</u> services.  <u>See</u> <u>Voorhees</u>, 246 N.J. Super. at 569 (the duty to defend arises when "the pleadings state facts bringing the injury within the coverage of the policy").  It is noteworthy that in thousands of pages of discovery, no evidence has been uncovered suggesting that WATG had any connection to the construction project other than in its role as an architect.  Indeed, Plaintiff's counsel conceded as much at the June 2, 2008 hearing.

misconduct related to WATG's provision of professional services.[9]

Plaintiff refers generally to the fact that some of the

underlying complaints contained claims of nuisance and general

negligence,[10] but, as is explained, _supra_, the facts actually

alleged by the plaintiffs in support of their claims indicate

that those claims are clearly directed at WATG's provision of

professional services, not its general business activities (or

any other non-professional conduct). See _L.C.S._, 371 N.J. Super.

at 490 ("An insurer's duty to defend an action against the

insured is determined by whether the allegations set forth in the

complainant's pleadings fall within the purview of the policy

language.").

    Instead of addressing the actual contents of the underlying

complaints, Plaintiff relies heavily on the fact that the Case

Information Statements submitted with those complaints did not

contain checks in the boxes indicating that the cases were

"professional malpractice case[s]."  N.J. Court Rules App. XII-B.

---

    [9]  As Defendants note, Plaintiff's professional liability
insurer, CCA, apparently did not find the allegations in any of
these complaints to be ambiguous, in that it appears to have
determined that all complaints fell within the scope of
Plaintiff's professional liability insurance policy.  See _Search
EDP, Inc._, 267 N.J. Super at 541-42 ("The insured's reasonable
expectation . . . is that the risk of claims of professional
negligence is protected against by the errors and omissions
policy and other claims of negligence by the general liability
policy.").

    [10]  See note 5, _supra_.

24

But in light of the fact that the "allegations set forth in the complainant's pleadings" indicate unmistakably that the claims focus on WATG's provision of professional services, L.C.S., 371 N.J. Super. at 490, the failure to affix a "professional malpractice case" label to the complaints is too slender a reed to support the weight that Plaintiff attributes to it.[11]

In summary, because the allegations in the underlying complaints show that the claims in those complaints focused on WATG's provision of professional services, and because such claims are excluded from coverage under both Defendants' policies, Defendants did not breach their contractual obligations to Plaintiff when they declined to defend Plaintiff against the claims filed in connection with the Tropicana garage collapse. Defendants' motion for summary judgment as to Counts I through IV of the Complaint will accordingly be granted, and Plaintiff's

---

[11] As Defendants note, because the underlying complaints were all filed against a large group of defendants that included both professional and non-professional parties, the plaintiffs in those cases might have declined to label their cases as "professional malpractice case[s]."  N.J. Court Rules App. XII-B. In any case, because the allegations contained in the complaints make clear that the injuries complained of allegedly resulted from WATG's provision of professional services, and New Jersey law provides that such allegations are determinative in assessing whether coverage under an insurance policy is required, Voorhees, 128 N.J. at 173, the Court need not speculate as to the motives of the attorneys who completed the Case Information Statements. It is the allegations in the complaints the Court must consider, and those allegations clearly focus on injuries allegedly resulting from WATG's provision of professional services.

cross-motion for summary judgment as to those Counts will be denied.

        2.   Breach of Duty of Good Faith and Fair Dealing
             Claims

_____The Court will likewise grant Defendants' motion for summary judgment as to Plaintiff's claims that Defendants breached their duty of good faith and fair dealing to Plaintiff in failing to defend Plaintiff against the claims arising out of the garage collapse.  To prevail on such a claim, Plaintiff must demonstrate that Defendants lacked a reasonable basis to deny the insurance claim, and that Defendants knew of or recklessly disregarded the absence of such a reasonable basis.  See Tarsio v. Provident Ins. Co., 108 F. Supp. 2d 397, 400-01 (D.N.J. 2000) (citations omitted).  As all parties agree, an insured whose claim of insurance coverage is "fairly debatable" cannot recover under a breach of good faith claim against the insurer.  Pickett, 131 N.J. at 473.  "Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim."  Id.  Because, as is explained, supra, Plaintiff cannot prevail on its substantive breach of contract claims, its breach of good faith claims must likewise be denied.

26

Accordingly, the Court will grant Defendants' motion for summary judgment as to Counts V and VI of the Complaint, and deny Plaintiff's cross-motion for summary judgment as to those Counts.

**IV.   CONCLUSION**

For the reasons explained above, the Court will grant Defendants' motion for summary judgment and deny Plaintiff's cross-motion for summary judgment.  The accompanying Order will be entered.

**June 5, 2008**                                                   **s/ Jerome B. Simandle**
Date                                                          JEROME B. SIMANDLE
                                                             United States District Judge